IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JAMILA JOHNSON, et al.<br><br>Plaintiffs,<br><br>v.<br><br>KYLE ARDOIN, in his official capacity as<br>the Acting Secretary of State of Louisiana,<br><br>Defendant. | Case No. 3:18-cv-625-SDD-EWD |

## MEMORADUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTFFS' FIRST AMENDED COMPLAINT

Plaintiffs bring a claim under § 2 of the Voting Rights Act of 1965 ("VRA") alleging that the Louisiana Legislature intentionally "packed" and "cracked" African American voters to dilute their vote when it created a single majority-minority district in Louisiana following the 2010 census. As such, Plaintiffs seek declaratory and injunctive relief as well as a court-ordered re-drawing of at least some of Louisiana's Congressional Districts.

As a threshold matter, this Court lacks jurisdiction to hear this case because Plaintiffs have failed to request a three-judge court pursuant to 28 U.S.C. § 2284. Notwithstanding the three-judge deficiency, this Court lacks subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) because Plaintiffs lack standing to bring these claims. Furthermore, the Plaintiffs never sufficiently allege that a second *compact* congressional district can be created in Louisiana. Because of these issues, and other defects found on the face of the Amended Complaint, Plaintiffs have failed to state a claim under 12(b)(6). Finally, this case should be dismissed on the equitable ground of laches since Plaintiffs waited until mere months before the fourth congressional elections held under the current Louisiana apportionment plan, and seek a new plan for only the fifth and last election cycle to be held under the current plan.

I. **Plaintiffs Have Failed to Request a Three-Judge Panel and Therefore this Court Should Dismiss the Amended Complaint.**

Section 2284 of Chapter 28 of the United States Code states, in relevant part, that "[a] district court of three judges shall be convened . . . when an action is filed challenging the constitutionality of the apportionment of congressional districts . . . ." 28 U.S.C. § 2284. Through artful pleading, Plaintiffs attempt to avoid the statutory trigger for a three-judge court under 28 U.S.C. § 2284 by omitting the word "constitutional," but labels—such as "Voting Rights Act claim"—and theories do not control over the substance of the allegations contained within a complaint. *See e.g., Skinner v. Switzer*, 562 U.S. 521, 530 (2010); *Thompson v. Allstate Ins. Co.*, 476 F. 2d 746, 749 (5th Cir. 1973).

The Amended Complaint pleads a fifteenth amendment challenge to Louisiana's 2011 congressional apportionment.  As the Supreme Court has said:

> [A]s to the application of the statute called for by the complaint, whatever precisely may be the reach of the Fifteenth Amendment, it is enough to say that the conduct charged—discrimination by state officials, within the course of their official duties, against the voting rights of United States citizens, on the grounds of race or color—is certainly, as 'state action' and the clearest form of it, subject to the ban of that Amendment. . . .

*United States v. Raines*, 362 U.S. 17, 25 (1960); *see also e.g.*, *Nevett v. Sides*, 571 F. 2d 209 (5th Cir. 1978) (allegations of racially motivated official action that infringes or dilutes the right to vote states a cause of action under the Fifteenth Amendment); *Irby v. Virginia State Bd. of Elections*, 889 F. 2d 1352 (4th Cir. 1989) (allegations of discriminatory intent or motivation in matters of race implicate the Fifteenth Amendment). The Amended Complain is rife with statements implicating the Fifteenth Amendment. *See, e.g.,* Amend. Comp. at ¶ 3("[T]he Louisiana State Legislature . . . chose to limit minority voting strength and political influence by 'packing' African-American voters into one majority-minority district . . . ."); *id.* at ¶ 4 ("African-American voters were packed into the Second Congressional District . . . ."); *id.* at ¶ 10 ("Louisiana's failure

to create a second majority-minority congressional district in its 2011 Congressional Plan has resulted in the dilution of African-American voting strength . . . ."); *id.* at ¶ 34 (attributing discriminative intent to the Governor by threatening a veto a plan that "was killed in" committee because of the threat); *id.* at ¶ 39 (alleging that voters were "cracked" in CDs 5 and 6 and then "packed" in CD 2); *id.* at ¶¶ 44-71 (alleging *intentional* discrimination and official acts of racism that have "continued through the present day."). As is easily seen, the Amended Complaint, taken as a whole, does not merely plead an "effects" case under Section 2 of the VRA, but instead claims racially motivated state action against African-American voters, which is the essence of a claim under the Fifteenth Amendment.

Furthermore, an examination of the text reveals, as noted in *City of Mobile*, the underlying language of Section 2 of VRA and the Fifteenth Amendment are essentially identical. *See City of Mobile v. Bolden,* 446 U.S. 55, 61 (1980). The Fifteenth Amendment provides, "[t]he *right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color*, or previous condition of servitude . . . . " (emphasis added). Section 2 of the VRA provides:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner *which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color,* or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

52 U.S.C. § 10301(a) (emphasis added). Section (b) was added in 1982 in order to add the totality of the circumstances test.

The Plaintiffs' actions in this case create an issue of first impression for the federal judiciary: can a plaintiff skirt the provisions of 28 U.S.C. § 2284, and therefore avoid a three-judge panel, by not expressly mentioning constitutional claims when bringing a claim under Section 2

of the VRA? As will be shown, this attempted end-run around federal law is as ill-fated as it is unprecedented.[1]

As the United States Supreme Court noted in *City of Mobile v. Bolden*, "Section 2 was an uncontroversial provision in proposed legislation whose other provisions engendered protracted dispute. . . . The view that this section simply restated the prohibitions already contained in the Fifteenth Amendment was expressed without contradiction during the Senate hearings." 446 U.S. at 61. Both the legislative history of 28 U.S.C. § 2284 and purposes and effect of the Voting Rights Act lead inexorably to the conclusion that this action should be dismissed, or alternatively, referred to the Chief Justice for Fifth Circuit for the impaneling of a three-judge court. In fact, pursuant to 28 U.S.C. § 2284 this Court lacks power to do anything else.

> **a. The Purposes of the Voting Rights Act and the Legislative History of Section 2284 Make Clear that all Cases Brought Under the Voting Rights Act Are Required to Be Heard by a Panel of Three Judges.**

In *Page v. Bartels*, the Court of Appeals for the Third Circuit looked extensively at the history and purpose of both the Voting Rights Act and Section 2284. 248 F.3d 175 (3d Cir. 2001). The court in *Page* held that when constitutional and VRA claims are brought together, a single district court judge could not separately reach claims brought under the VRA without referring the case to a three judge panel under 28 U.S.C. § 2284.[2] *Id.* at 190. As an initial matter, it is well

---

[1] It is interesting to note that a review of the case law shows that singular claims under the VRA are exceedingly rare. In fact, Counsel for Defendant is unaware of any instance such a claim made it past the Motion to Dismiss stage. *See Huertas v. City of Camden*, 245 Fed. Appx. 168 (3d Cir. 2007). However, Plaintiffs' counsel now brings three such claims, including this one, presumably in an effort to avoid a three-judge panel for reasons that are currently unclear. *See Chestnut v. Merrill*, No. 2:18-cv-907 (N.D. Ala. 2018); *Dwight v. Kemp*, No. 1:18-cv-2869 (N.D. Ga. 2018).

[2] While the holding and underlying facts in *Page* are not entirely on point, the same reasoning undergirding the court's holding, and its discussion of the history and purpose of the three-judge court statute, is wholly applicable here. Furthermore, there is a lack of precedent in this context simply because VRA claims are universally brought in concert with claims under the Fourteenth or Fifteenth Amendments. Based on counsel's research, this instant action and two cases filed the same day as the Original Complaint in this matter in federal courts in Georgia and Alabama by the same counsel appear to be the first time congressional districts have ever been challenged under Section 2 without an express invocation of a constitutional amendment in the complaint. *Compare* Orig. Comp. (Doc. No. 1) (*filed* June 13, 2018) *with Chestnut*, No. 2:18-cv-907 (*filed* June 13, 2018) *and Dwight*, No. 1:18-cv-2869 (*filed* June 13, 2018).

accepted by the courts that the VRA is simply the method by which Congress chose to enforce the provisions of the Fourteenth and Fifteenth Amendments. *See, e.g., City of Boerne v. Flores*, 521 U.S. 507, 518 (1997) ("We have also concluded that . . . measures protecting voting rights are within Congress' power to enforce the Fourteenth and Fifteenth Amendments, despite the burdens those measures placed on the States."); *Lewis v. Governor of Ala.,* No. 17-11009, *17-18 (11th Cir. July 25, 2018) ("The Voting Rights Act, which is designed to implement the Fifteenth Amendment and, in some respects, the Fourteenth Amendment was enacted pursuant to an identical enforcement provision, U.S. Const. amend. XV, § 2, which the Supreme Court has referred to [in *City of Boerne*] as a parallel power to enforce the provisions of the Fifteenth Amendment." (internal quotations and citations omitted)); U.S. Const. amend. XV, § 2 ("The Congress shall have the power to enforce this article by appropriate legislation."); U.S. Const. amend. XIV, § 5 ("The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.").

In 1976, Congress revised 28 U.S.C. § 2284 to its current form "in response to complaints" that the statute as then written was "cumbersome, labyrinthine, and unnecessary." *Page*, 248 F.3d at 189. When enacting the change it is clear from the legislative history that "Congress was concerned less with the source of the law on which the apportionment challenge was based than on the *unique importance of apportionment cases generally*." *Id.* at 190 (emphasis added). This is further reinforced by the fact that when the 1976 amendments were made, the only possible claim to invalidate a congressional apportionment under the VRA was under §5, which itself provides for a three-judge court. *Id.* at 189-90. In other words, when Congress amended § 2284 it appeared nearly impossible for "any case involving congressional reapportionment," *see* 28 U.S.C. § 2284,

to be brought in federal court and *not* be subject to a panel of three-judges. *See Page*, 248 F.3d at 189; *see also Allen v. State Bd. of Elections*, 393 U.S. 544, 569 (1969).

This properly captures Congress' understanding of the three-judge statute at the time it was written because "[t]he Senate Report . . . consistently states that 'three-judge courts would be retained . . . in any case involving congressional reapportionment or the reapportionment of any statewide legislative body. . . .'" *Page*, 248 F.3d at 190 (second alteration in original) (citing and quoting S. Rep. No. 94-204 (1976), reprinted in 1976 U.S.C.C.A.N. 1988, 1988). As such, "[c]hallenges to apportionment are the kinds of claims requiring what has been described as the 'special and extraordinary procedure' represented by the convening of a three-judge district court." *Page*, 248 F.3d at 190 (citing and quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 155 (1963)). Supreme Court precedent and the text of the Constitution itself further reinforces what Congress surely understood that "any case involving congressional reapportionment or the reapportionment of any statewide legislative body", 28 U.S.C. § 2284, would *necessarily* be constitutional in nature.

The Supreme Court has long held that the various provisions of the VRA are simply the implementations of the substantive rights granted by the Civil War amendments (i.e. the Thirteenth, Fourteenth, and Fifteenth Amendments to the U.S. Constitution). It is axiomatic at this point that "[u]nder our Constitution, the Federal Government is one of enumerated powers." *City of Boerne*, 521 U.S. at 516. The power of the judiciary "to determine the constitutionality of laws . . . is based on the premise that the 'powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written.'" *Id* (quoting *Marbury v. Madison*, 5 U.S. 137 (1803). In *South Carolina v. Katzenbach*, the Supreme Court said what has become obvious in the civil rights context

§ 2 of the Fifteenth Amendment expressly declares that 'Congress shall have the power to enforce this article by appropriate legislation.' By adding this authorization, the Framers indicated that Congress was to be chiefly responsible for implementing the rights created in § 1. 'It is the power of Congress which has been enlarged. Congress is authorized to *enforce* the prohibitions by appropriate legislation. Some legislation is contemplated to make the Civil War amendments fully effective.'

383 U.S. 301, 325-26 (1966) (quoting *Ex parte Virginia*, 100 U.S. 339, 345 (1879)); *see also Northwest Austin Mun. Util. Dist. No. One v. Mukasey*, 573 F. Supp. 2d 221, 226 (D.C. Cir. 2008) ("The fundamental principal guiding the Court [in *Katzenbach*] was this: 'As against the reserved powers of the States, Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting.'" (quoting *Katzenbach*, 383 U.S. at 324).

This constitutional undergirding is essential since, under the terms of the Elections Clause, congress is only permitted to intervene in elections under either the terms of Article I § IV itself or a substantive constitutional provision. The Elections Clause states that "[t]he times, places and manner of holding elections for . . . Representatives, shall be prescribed in each state by the legislature thereof; but Congress may at any time by law make or alter such regulations . . . ." U.S. Const. art. I, § IV. Therefore, it is the legislature of the states that are given primacy in reapportionment. Congress cannot interfere with that right but for their reserved power under the elections clause to "make or alter such regulations" or a grant of power under another substantive constitutional provision, i.e. the Fourteenth, *see, e.g., United States v. Blaine Cty.*, ("[W]e hold that the results test is a constitutional exercise of Congress' Fourteenth and Fifteenth Amendment enforcement powers."), or Fifteenth Amendments, *see id*; *see also Katzenbach*, 383 U.S. at 325-36. In either event, Congress would be without authority to enforce the VRA but for a substantive grant of such power by a constitutional provision. This system is fundamental to the federalism concerns inherent in redistricting litigation. *See Ariz. State Legislature v. Ariz. Indep. Redistricting*

*Comm'n*, 135 S. Ct. 2652, 2667 (2015) (Reapportionment "involves lawmaking in its essential features and most important aspect.").

This Court, composed of a single judge, lacks subject matter jurisdiction over this matter. Defendant requests that if this portion of the Motion to Dismiss is denied, that the question be certified for immediate appeal pursuant to 26 U.S.C. § 1292(b), because it is a significantly important question and it is vital to the judicial economy of this matter.[3] *Sandoz v. Cingular Wireless LLC*, 553 F.3d 913, 914-15 (5th Cir. 2008) (accepting certified question of a denial of motion to dismiss for lack of subject matter jurisdiction); *Lemery v. Ford Motor Co.,* 244 F. Supp. 2d 720, 728-29 (S.D. Tex. 2002) (district court certifying question under § 1292(b) as there was an outstanding "controlling question of law concerning the Court's subject matter jurisdiction.") If a single judge does not have jurisdiction over this claim, it would be a significant waste of resources to proceed with this action for it to be vacated, only to have to rehear the entire matter before a fully composed three-judge panel. *See Lemery,* 244 F. Supp. 2d at 728 ("It would pain the Court to see both attorneys of this excellence and well motivated Parties proceed to judgment after considerable expense and delay, only to discover that the judgment must be overturned on appeal because the federal judiciary lacks subject matter jurisdiction.").

## II.     This Court Is Without Jurisdiction as Plaintiffs Lack Standing to Bring Their Claims.

### a.  Legal Standard

The determination of whether a case or controversy exists is jurisdictional. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-241 (1937). When a Motion to Dismiss is predicated on

---

[3] 28 U.S.C. § 1292(b) states, in relevant part, that "[w]hen a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order."

jurisdictional and other grounds, the court should first resolve the jurisdictional issue before an attack on the merits of the claim. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

When addressing a lack of subject matter jurisdiction, "[a] court may base its disposition of a motion to dismiss . . . on (1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Robinson v. TCI/US West Commc'n*, 117 F.3d 900, 904 (5th Cir. 1997). The allegations in the Plaintiffs' Amended or Original Complaint receive no presumption of truthfulness when determining whether the court has jurisdiction. *Montez v. Dep't of the Navy*, 392 F.3d 147, 149 (5th Cir. 2004). Accordingly, the burden of proof for a Motion to Dismiss under Rule 12(b)(1) is on the party asserting jurisdiction. *Ramming*, 281 F.3d. at 161. In this case, the Plaintiff constantly bears this burden. *See id.*

As this Court is no doubt aware, Article III of the U.S. Constitution limits the jurisdiction of federal courts to "cases" or "controversies." *See* U.S. Const. art. III, § 2; *Allen v. Wright*, 468 U.S. 737, 750 (1984); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992). "The case-or-controversy doctrines state fundamental limits on federal judicial power in our system of government." *Allen*, 468 U.S. at 750. Standing "is perhaps the most important of these doctrines." *Id*. To invoke federal jurisdiction under Article III, a plaintiff must establish the following "irreducible constitutional minimum[s] of standing": (1) an injury-in-fact; (2) traceability; and (3) redressability. *Lujan*, 504 U.S. at 560-61. The Supreme Court has never held a specialized test for standing in VRA cases and therefore the well trod principles of standing found in *Lujan* and its progeny apply. *Cf. Comm. for a Fair & Balanced Map v. Elections*, No. 11-cv-5065, 2011 U.S. Dist. LEXIS 126278, *5 (N.D. Ill. Nov. 1, 2011) ("A plaintiff who satisfies the constitutional standing requirements for a vote dilution claim under the Voting Rights Act also satisfies the

constitutional standing requirements for such a claim under the Fourteenth and Fifteenth Amendments").

Nowhere in their Amended Complaint do Plaintiffs meet the "irreducible constitutional minimum[s]" of standing required by *Lujan* and its progeny. To meet the redressability requirement a plaintiff must "show[] that a favorable decision will relieve a discrete injury to himself." *James v. City of Dallas*, 254 F.3d 551, 556, n.14 (5th Cir. 2001). "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). Without standing, Plaintiffs merely make a "generalized grievance against governmental conduct of which he or she does not approve." *United States v. Hays*, 515 U.S. 737, 745 (1995); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1921 (2018).

The Supreme Court in *Gingles* stated that to make a successful claim under § 2, "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986). Therefore, any viable § 2 remedy *must be reasonably compact*. *League of Latin Am. Citizens v. Perry*, 548 U.S. 399, 430 (2006) (identifying factors relevant to § 2 claims); *see also Bush v. Vera*, 517 U.S. 952, 979 (1996) ("If, because of the dispersion of the minority population, a reasonably compact majority-minority district cannot be created, § 2 does not require a majority-minority district; if a reasonably compact district can be created, nothing in § 2 requires the race based creation of a district that is far from compact."). Plaintiffs have failed to produce any proof that: (1) any of the Plaintiffs would actually live in either newly created majority-minority district; and (2) the newly formed districts containing Plaintiffs would be reasonably compact. The lack of a viable remedial plan is a pleading failure under Rule 8 and *Iqbal*. *See Broward Citizens for Fair*

*Dists. v. Broward Cty.*, 2012 U.S. Dist. LEXIS 46828, *18, n. 6 (S.D. Fla. 2012) ("The first *Gingles* factor . . . requir[es] a plaintiff to demonstrate the existence of a proper remedy. Plaintiffs mere allegation that [a possible remedial maps exist] is conclusory and insufficient to meet Plaintiffs' pleading burden."). The Supreme Court has "set out the condition that a challenge to an existing set of single-member districts must show the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *League of Latin Am. Citizens*, 548 U.S. 399 (internal quotations omitted). The failure of Plaintiffs to allege with any specificity that they would, could, or will live within one of two reasonably compact majority-minority districts deprives them of standing.

Further, there has been no allegation that every Plaintiff would, if taken together, fall within a remedial majority-minority district or plan. Plaintiffs' reference to three as of yet produced 2011 plans by Louisiana legislators are unavailing. *See* Amended Comp. at ¶¶ 34-35. The plan by Senator Jackson proposed a district of only "36% African-American voting age population" and a "similar . . . district was proposed by [Representative] Rick Gallot", *see* Amend. Comp. at ¶34, which are insufficient as a matter of law to constitute a majority-minority district. *Gingles*, 478 U.S. at 50-51. Plaintiffs state that the plan presented by Senate Pro Tempore Sharon Weston Broome "would have included, among other parishes, East Feliciana, West Feliciana, and St. Helena parishes, in their entirety, as well as *the bulk of East Baton Rouge Parish's African-American voting Age population*" and as such would comprise a sufficiently compact plan. Amend. Comp. at ¶ 35 (emphasis added). However, this is the exact type of legislative hunting-and-pecking language that is indicative of efforts to find exclusively African-American voters for its own sake—a process which the Constitution detests[4]. *See Cooper v. Harris*, 137 S. Ct. 1455, 1464

---

[4] The standing issues in this case further highlight why VRA claims have been brought almost exclusively with claims under the Fourteenth and/or Fifteenth Amendments. *See Hays*, 515 U.S. at 741 (alleging violation of the Voting

(2017); *see generally Hays v. State of Louisiana*, 839 F. Supp. 1188 (hereinafter, *Hays I*) (rejecting a second majority-minority district in Louisiana as a racial gerrymander because, *inter alia*, it failed to adhere to traditional districting principles.). In VRA cases it is not just the total number of voters available to create a majority-minority district, it is what must be done—by either the Legislature or the Courts—to include those African-American voters in said district(s). *See Cooper*, 137 S. Ct. at 1464. To put it simply, this Court cannot "fix" a VRA violation, if one exists, by mandating a map that is violative of the U.S. Constitution.

In this case, Plaintiffs have alleged that their votes are diluted and as such have requested two majority-minority districts to remedy the alleged wrong. Amend. Comp. at ¶¶ 16-25, 93. However, Plaintiffs have failed to prove that they would reside in a reasonably compact congressional district created to provide a remedy to their complained of harms. Therefore, since Plaintiffs fail to maintain standing, this case should be dismissed.

**b. Plaintiffs Have Failed to Show that they Would Reside in any Reasonably Compact Remedial District**

**i. Standing of Plaintiffs Living Specifically Within Louisiana's Congressional District 2.**

Plaintiffs Johnson,[5] Henderson, Thomas, and Howard all currently reside in Congressional District 2 ("CD-2"). *See* Amend. Comp. at ¶¶ 15-18. CD-2 is currently Louisiana's only majority-minority district. The Plaintiffs who reside in CD-2 do not specifically request that their own

---

Rights Act and the Fourteenth Amendment); *see also Gingles*, 478. U.S. at 35. When looking at Voting Rights Act claims, it is always important to analyze whether a remedy, if one is even possible, violates the U.S. Constitution. *See Cooper*, 137 S. Ct. at 1464 ("When a State invokes the VRA to justify race-based districting, it must show . . . that it had a strong basis in evidence for concluding that the statute required its action." (internal quotations omitted). After all, what good is a "remedial map" if such a map requires the invidious racial motive that the State would not have been permitted to engage in and of which the constitution abhors. *See, e.g., Id.*

[5] Plaintiff Johnson has yet to suffer any harm at all as she is a new resident of the district and has yet to vote in any election in CD-2. Amend. Comp. at ¶15 (Ms. Johnson "*will vote* for a candidate for the U.S. house of Representatives in CD 2 for the first time in the November 2018 general election." (emphasis added)). Some future hypothetical harm, without more, is insufficient for standing purposes.

district be redrawn, but instead seek "the adoption of a valid congressional redistricting plan for Louisiana that includes two majority-minority districts." *Id.* at 28C. Federal courts in Louisiana have thrice rejected the Louisiana legislature's attempts to do just that. In *Hays I*, the state of Louisiana, crafted a map with two majority-minority congressional districts in order to comply with the U.S. Attorney General's office's insistence that only a map with two such districts would be "precleared." 839 F. Supp. at 1197-98, n. 21. That map was found to be a racial gerrymander. *Id.* at 1215-16. Louisiana subsequently drafted yet another plan with two majority-minority districts, which was also found to be a racial gerrymander. *Hays v. Louisiana*, 862 F. Supp. 119, 125 (W.D. La. 1994) (hereinafter, *Hays II*). The district court drew its own plan and was only able to create one majority-minority district because the court "did not carve districts along race lines, except in District 2, where the Constitution and fairness requires us to consider it." *Id. Hays II* was subsequently vacated by the Supreme Court on standing grounds. *United States v. Hays*, 515 U.S. 737 (1995). *Hays* came back again to the district court "like the Australian who went bonkers trying to throw away his old boomerang" and the two majority-minority district plan was once again invalidated and once again a plan with a single majority-minority district was put in its place. *Hays v. Louisiana*, 936 F. Supp. 360 (W.D. La. 1996) (hereinafter, *Hays III*).

In the *racial gerrymandering context*, the Supreme Court has held that a plaintiff only has standing to challenge the district in which the plaintiff resides. *Hays,* 515 U.S. at 744-45; *Shaw v. Hunt*, 517 U.S. 899, 904 (1996). However, pursuant to Plaintiffs' Amended Complaint and attempt at artful pleading, they have brought a claim under § 2 of the VRA. *See* Amend. Comp. at ¶¶ 90-97; *see also supra* at 2-8. Vote-dilution, which Plaintiffs attempt to singularly allege, cannot be remedied "by creating a safe majority-black district *somewhere else* in the State." *Shaw*, 517 U.S. at 917 (emphasis added). Instead, "for standing purposes, to the extent plaintiffs' alleged harm

from gerrymandering is the dilution of their votes, that injury is *district specific*." *Gill*, 138 S. Ct. at 1930 (emphasis added). Consequently, "plaintiff's remedy must be 'limited to the inadequacy that produced [his] injury-in-fact.'" *Id.* (internal alterations in original) (citing and quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). There is no specific evidence in the Amended Complaint that the creation of a second majority-minority district would remedy any injury specific to Plaintiffs' residing in CD-2. Furthermore, since Plaintiffs maintain they do not bring a *Shaw* based intentional racial gerrymandering claim, and also fail to allege how a second congressional district somewhere in the state would remedy their harm, they are unable to maintain standing as there is nothing but an assertion that they are "packed." Therefore, the Plaintiffs residing in CD-2 currently lack standing to bring their claims.

> **ii.    Standing of Plaintiffs Living Specifically Within Louisiana's Congressional District's 5 and 6.**

Plaintiffs Rogers, Armstrong, Smith, Hart, Lanus, Chaney, and Galmon fail to adduce any facts that show they would actually live in any majority-minority district that this Court may order. Plaintiffs each allege that "an additional majority-minority district could be drawn incorporating" the parish in which the Plaintiffs live "in its entirety." *See* Amend. Comp. ¶¶ 19-25. There were no facts adduced that any of the Plaintiffs currently living in CD-5 or 6 (or CD-2 for that matter) would actually reside in any newly created compact majority-minority district—should one be drawn. No specific map was provided nor were any other facts alleged that would allow the Court to conclude Plaintiffs' harm could or would be remedied. *Broward Citizens for Fair Dists.*, 2012 U.S. Dist. LEXIS 46828, *18, n. 6. Plaintiffs cannot baldly assert that something amounting to "trust us, we promise we will be in some compact remedial district" and expect that to be sufficient for standing purposes.  As a practical matter, counties—or in the case of Louisiana, parishes—are often split to comply with various traditional districting criteria, chief of which is the equal

population requirements found in *Baker v. Carr* and its progeny. 369 U.S. 186 (1962); *see also Gray v. Sanders*, 372 U.S. 368 (1962). Plaintiffs' statement that their parish's will be contained within some remedial district "in [their] entirety" does nothing to advance their Amended Complaint in this regard. As a result, Defendant continues to have no way to know if there is a remedy to Plaintiffs' alleged harm.

### c. The Secretary of State Lacks the Power to Implement Any Remedy the Court May Order.

Finally, it is an "elemental fact that a state official cannot be enjoined to act in any way that is beyond his authority to act in the first place." *Okpalobi v. Foster*, 244 F. 3d 405, 427 (5th Cir. 2001). It is unquestionable that the Secretary of State cannot redress the Plaintiffs' alleged injury. The Secretary has no authority to draw congressional districts in the first instance or re-draw districts to, or change the composition of any district. *See* La. Const. art. IV, § 7. Finally, the Secretary of State has no ability to amend La. R.S. 18:1276.1, the statute that Plaintiffs challenge in their Amended Complaint. *See* La. Const. art. III, § I (vesting the legislative power with the Louisiana Legislature). The Secretary does not have the authority to effectuate a cure for the injury about which the Plaintiffs sue. Therefore, this case should be dismissed because the Plaintiffs' Amended Complaint is one that the Secretary simply cannot, by law, fix.

### III. Plaintiffs Have Failed to State a Claim Under 12(b)(6) and Therefore this Case Should Be Dismissed.

#### a. Legal Standard

A pleading must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). "The pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). As such, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id*; *compare* Amend. Comp. ¶ 92 ("African Americans in Louisiana, including African Americans in the areas where Plaintiffs reside, are sufficiently numerous and geographically compact to constitute a majority of eligible voters in two congressional districts."); *with Gingles*, 478 U.S. at 50 (The first element under *Gingles* is that "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal,* 556 US. at 678. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Id*. Although a district court must assume the veracity of well-pleaded facts, a complaint that "fail[s] to show more than mere conclusory allegations" is properly met with dismissal for failure to state a claim. *Smith v. Dep't of Health & Hosps. La.*, 581 Fed. Appx. 319 (5th Cir 2014) (citing *City of Clinton v. Pilgrim's Pride Corp.*, 632 F. 3d 148, 155 (5th Cir. 2010)). Plaintiffs' Amended Complaint continues to be rife with the exact sort of unadorned and conclusory allegations that *Iqbal*, *Twombly*, and their progeny sought to eliminate.

### b. Plaintiffs Fail to Sufficiently Allege that African American Voters can Constitute a Reasonably Compact Majority in Two Districts.

As discussed *supra*, the Supreme Court in *Gingles* stated that to make a successful claim under § 2, "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at

50-51. There are two operative parts to the first *Gingles* precondition: numerosity and compactness. Plaintiffs repeatedly allege that "African Americans in Louisiana are sufficiently numerous and geographically compact to constitute a majority of eligible voters in two congressional districts." *See* Amend. Comp. at ¶¶ 93.

Assuming there is enough BVAP to constitute two majority-minority districts in Louisiana, there is no shred of "factual matter" anywhere in the Amended Complaint, "taken as true" that two *compact* districts could be created. *See Twombly*, 550 U.S. at 555. "Satisfying the first *Gingles* precondition—compactness—normally requires submitting as evidence hypothetical redistricting schemes in the form of illustrative plans." *Gonzalez v. Harris County*, 601 Fed. Appx. 255, 258 (5th Cir. 2015) (per curium); *see also Fairley v. Hattiesburg,* 584 F.3d 660, 669 (5th Cir. 2009) ("Requiring the district court to fish through the record for evidence that might conceivably support redistricting approaches that were never urged by the plaintiffs or presented as a developed plans would be downright perverse."). In fact, the Court of Appeals for the Eleventh Circuit requires the demonstration of a proper remedy through maps, a failure of which constitutes a pleading deficiency sufficient to warrant dismissal under Rule 8 and *Iqbal*. *Broward Citizens for Fair Dists. v. Broward County*, 2012 U.S. Dist. LEXIS 46828, *18, n. 6 (S.D. Fla. 2012); *see also Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999).

The vague references to the plans submitted, but not passed, in 2011 are unavailing[6]. *See supra* at 11-12. First, Plaintiffs attempt to imply racial animus by reference to the fact that these proposed maps were not adopted by the Louisiana Legislature. *See* Amend. Comp. at ¶ 35 ("All African-American members of the Senate voted in favor of the amendments as did the overwhelming majority of African-American members of the House.") However, this appeal to

---

[6] The non-specific references to the alleged population numbers and, more generally, the redistricting plans themselves further highlight the need for a map in complex Section 2 and racial gerrymandering litigation.

racial motive must be rejected since it is now well established that "[t]he allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination." *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018). In essence, simply pointing to plans submitted by various members of the Legislature does nothing to fix Plaintiffs' lack of pleaded facts. Nothing is known about these plans other than all three of them are facially defective: two for not constituting enough African-American voters to constitute a majority in two districts, *see Gingles*, 478 U.S. at 50, and the third for not alleging a second district—CD 5—will actually perform to allow African-American voters to elect a candidate of their choice, *see Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 802 (2017). Also, while Plaintiffs repeatedly state that two reasonably compact districts can be drawn—as if saying something enough times makes it either true in fact or sufficient under *Iqbal*—does not actually make it so.

A remedial map has special importance when, as here, there is a history of litigation in the relevant jurisdiction which resulted in the utter failure to produce a legally compliant second majority-minority district. *See generally Hays I*, 839 F. Supp. 1188; *Hays II,* 862 F. Supp. 119; *Hays III*, 936 F. Supp. 360. As discussed *supra*, in each *Hays* case the Louisiana Legislature attempted to draw a second majority-minority district expressly for the purpose of gaining pre-clearance under § 5. *See e.g., Hays II*, 936 F. Supp. at 363 ("From the outset the legislators received unmistakable advisories from the Attorney General's office that only redistricting legislation containing two majority-minority district would be approved . . . , so the Legislature directed its energies toward crafting such a plan."[7]). In fact, "[t]he primary justification espoused by the State for the enactment of . . . a second majority-minority district was [that it] was <u>required</u> under the

---

[7] It also should be noted that, likely as a result of *Hays I-III*, no such demand for a second majority-minority district was made by the Attorney General's office when applying for pre-clearance after the 2010 census. The Attorney General's office promptly pre-cleared the map with a single majority-minority district. *See* Letter of Assistant Attorney General Day, Aug. 01, 2011.

Voting Rights Act." *Hays III*, 936 F. Supp. at 369 (emphasis in original). However, like many cases since the Supreme Court's decision in *Shaw v. Reno*, the Voting Rights Act justification was not enough to save the a second majority minority Congressional District in Louisiana from violating the Fourteenth Amendment. *Shaw v. Reno*, 509 U.S. 630 (1993); *see e.g., Miller v. Johnson*, 515 U.S. 900 (1995); *Cooper*, 137 S. Ct. at 1464 ("When a State invokes the VRA to justify race-based districting, it must show (to meet the 'narrow tailoring' requirement) that is had a 'strong basis in evidence' for concluding that the statute required its action." (quoting *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1274 (2015)); *Bethune-Hill,* 137 S. Ct. 788 (2017). Furthermore, taking the Plaintiffs' proposed BVAP at face value and comparing it with the population numbers found in *Hays III*, not much has changed in terms of population percentages.[8] *Compare* Amend. Comp. at ¶ 8 (alleging CD 2 has a BVAP of 59.7%, CD 5 has a BVAP of 33.7%, and CD 6 has a BVAP of 21.5%); *with Hays III*, 936 F. Supp. at 377 (showing similar population numbers as percentage of the district population as to what Plaintiffs allege).[9] While there have been noted changes in Louisiana's overall demographics since 2005 when Hurricane Katrina tragically forced various population movements within the region, the 2010 census data on which Plaintiffs must rely continue to bear out the fact that, at least as it pertains to the creation of a second majority-minority district, not much has changed. *Compare* Amend. Comp. at ¶ 8; *with Hays III*, 936 F. Supp. at 377.

---

[8] What has changed is that Louisiana *lost* a congressional seat as of the 2010 census, which would make it even more difficult to draw two compact majority-minority districts.

[9] Given the difficulties Plaintiffs' face in creating a compact map, made all the more evident as they have yet to produce one, is that Plaintiffs *may* be attempting to create a "minority opportunity district." This attempt, if one is being made at all, should be rejected by this court. *See Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) ("This Court has held that § 2 does not require the creation of influence districts.") (citing and quoting *League of Latin Am. Citizens*, 548 U.S. at 445).

Irrespective of whether a *map* is required at this stage, what cannot be doubted is that Plaintiffs were required to adduce *some* facts on compactness. This is not a case where Defendant is requiring an "unobjectionable map, before discovery even begins." *Luna v. County of Kern*, 2016 U.S. Dist. LEXIS 120208, *16 (2016). Setting aside the fact that the only valid data that is permissibly used to draw maps in these cases is the 2010 census, *see e.g., Missouri State Conf. of the NAACP v. Ferguon-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1030 (E.D. Mo. 2016) (explaining that census data is more appropriate for use than American Community Survey data), which has been publicly accessible for over 7 years, *see e.g., Hollinger v. Home State Mut. Ins. Co.* 654 F.3d 564, 571-72 ("United States census data is appropriate and frequent subject of judicial notice."), the lack of a map or *some other evidence* that a valid remedy is possible is absolutely required by Supreme Court precedent, *see Iqbal*, 556 U.S. at 678. In fact, without a plan or other facts showing that two majority-minority districts are plausible, Plaintiffs have given merely "a legal conclusion couched as a factual allegation" which amounts to nothing more than a "threadbare recital[] of the elements of a cause of action." *Iqbal*, 556 U.S. at 678; *compare* Amend. Comp. at ¶ 9 ("African Americans in Louisiana are sufficiently numerous and geographically compact to form a majority of eligible voters . . . in a second congressional district . . . .) *with Gingles*, 478 U.S. at 50 ("First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district."). *Twombly, Iqbal,* and the Rule 8 pleading standards play an important role in the fairness of our judicial system because they require fair notice to the Defendant of the claims against him. *See Twombly*, 550 U.S. at 555. Plaintiffs have wholly failed to sufficiently plead their case and as such this claim should be dismissed.

## IV.    The Equitable Doctrine of Laches Bars Plaintiffs Requested Relief.

The equitable doctrine of laches applies when there is "an inexcusable delay that results in prejudice to the defendant." *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998). Laches has three elements: "(1) delay in asserting a right or claim; (2) that the delay was inexcusable; and (3) that undue prejudice resulted from the delay." *Id*. (internal quotations and alterations omitted).

Plaintiffs waited seven years and three congressional elections to bring their claim. The redistricting statute was enacted in 2011, soon after the completion of the decennial census. *See* Acts 2011, 1st Extraordinary Session, No. 2, § 5(A) (codified in the Louisiana statutes as La.R.S. 18:1276.1). The plan was promptly precleared by the United States Justice Department under then Attorney General Eric Holder. There is no excuse for Plaintiffs' delay as the Plaintiffs should have known their rights were impacted upon the passage of the 2011 plan. Furthermore, records show that a similar voting rights act and racial gerrymandering claim was previously filed in 2013 by a group of plaintiffs residing in CD-2. *See Buckley v. Schedler*, No. 3:13-cv-00763, (M.D. La. 2013). The suit was subsequently dismissed without explanation and without prejudice upon motion of the plaintiffs. The five year delay in bringing a nearly identical claim is likewise unexplained and is evidence of inexcusable delay. The ability of Plaintiffs to bring suit before now cannot be doubted. The courts have been open these many years. The congressional districts were created in 2011 under the 2010 census. Other plaintiffs were able to bring virtually the same suit in 2013. *See Buckley*, No. 3:13-cv-00763. By waiting seven years to bring their claim, the Plaintiffs will prejudice the Secretary of State and people of Louisiana by throwing the election machinery into disarray for the benefit of a single election under the current apportionment plan. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (holding that, in the preliminary injunction context, waiting until five years into a redistricting cycle weighed against relief). Additionally, a reduced showing

of prejudice is required "[g]iven this litigation's temporal proximity to the next installment of census data and associated redistricting, the amount of time that has elapsed since the cause of action arose, and the fact that statewide elections were recently held, less prejudice is required to show laches in such an instance than had the Plaintiffs expeditiously asserted their rights." *Maxwell v. Foster*, 1999 U.S. Dist. LEXIS 23447, *10-11 (W.D. La. Nov. 24, 1999) (three-judge court).

In *Maxwell*, plaintiffs brought a claim challenging three of Louisiana's legislative districts as racial gerrymanders seven years after the apportionment plan was precleared by the Department of Justice. The Defendants, on Summary Judgment, raised the equitable doctrine of laches as a defense. *Id*. at *3. The district court found, *inter alia*, that equitable consideration are applicable to constitutional violations and "in particular [to] voting rights cases." *Id*. at *4 (citing *Reynolds v. Sims*, 377 U.S. 533 (1964)). And that "it is quite possible that after new districts are drawn in the normal course after the 2000 census that Plaintiffs would not even be in districts they would consider 'racial gerrymanders' [because] the new decennial electoral cycle will commence within a few months. . . ." *Id*. at *16. The fact that the plan was pre-cleared by the Department of Justice, just as this plan was, played a critical role in the district courts determination. *Id*. at *7. Plaintiffs' here bring claims that mirror those claims brought in *Maxwell* under exceedingly similar factual backgrounds. For this and other reasons, this Amended Complaint must be dismissed under the equitable doctrine of laches.

## CONCLUSION

For the aforementioned reasons this Court should dismiss this case. Alternatively, this court should either refer this case to the Chief Judge of the Fifth Circuit under 28 U.S.C § 2284 for appointment of a three-judge court, dismiss the case with leave to file yet another amended

complaint incorporating a three-judge request, or deny this motion with respect to the three-judge

court and immediately certify the 28 U.S.C. § 2284 issue for interlocutory review.

Dated: September 4, 2018                    Respectfully Submitted,

/s/ Jason Torchinsky                         JEFF LANDRY
Jason Torchinsky (VSB 47481)*                ATTORNEY GENERAL
Phillip M. Gordon (TX 24096085)*             /s/ Angelique Duhon Freel___
HOLTZMAN VOGEL JOSEFIAK                       Angelique Duhon Freel (La. Bar Roll No. 28561)
TORCHINSKY PLLC                              Elizabeth Murrill (La. Bar Roll No. 20685)
45 N. Hill Drive, Suite 100                  Carey Tom Jones (La. Bar Roll No. 07474)
Warrenton, VA 20186                          David Jeddie Smith, Jr. (La Bar Roll No. 27089)
Telephone: (540) 341-8808                    Jeffrey M. Wale (La. Bar Roll No. 36070)
Facsimile: (540) 341-8809                    Assistant Attorneys General
Email: jtorchinsky@hvjt.law                  Louisiana Department of Justice
pgordon@hvjt.law                             Civil Division
* Admitted Pro Hac Vice                      P. O. BOX 94005
                                             Baton Rouge, Louisiana 70804-9005
                                             Telephone: (225) 326-6060
                                             Facsimile: (225) 326-6098
Celia R. Cangelosi (La. Bar Roll No. 12140)  Email: walej@ag.state.la.us
5551 Corporate Blvd. Suite 101               freela@ag.louisiana.gov
Baton Rouge, LA  70808                       jonescar@ag.louisiana.gov
Telephone: 225-231-1453                      smithda@ag.louisiana.gov
Facsimile: 225-231-1456
Email: celiacan@bellsouth.net
Counsel for Defendant Louisiana Secretary of State

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that, on this 4th day of September 2018, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system which gives notice of filing to all counsel of record.

<u>/s/ *Jason B. Torchinsky*</u>