IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF LOUISIANA

|  |  |
|---|---|
| JAMILA JOHNSON, et al.<br><br>              Plaintiffs,<br><br>     v.<br><br>KYLE ARDOIN, in his official capacity as the Acting Secretary of State of Louisiana,<br><br>              Defendant | Case No. 18-625-SDD-EWD |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S SECOND
MOTION TO DISMISS**

## I.    INTRODUCTION

For the second time in this case Defendant moves to dismiss Plaintiffs' § 2 challenge to Louisiana's 2011 Congressional Map on a myriad of baseless grounds that should be rejected. Despite having had effectively three opportunities to make his case, Defendant offers this Court nothing new. Indeed, Defendant asserts, in large part, the same arguments made in his first motion and reply brief, often without even acknowledging, let alone responding to, the arguments raised by Plaintiffs in their original opposition brief, ECF No. 27 ("Pls.' First Opp."). After engaging in this exercise of willful ignorance, Defendant then invites this Court to also turn a blind eye to the law governing a vote dilution claim brought under § 2 of the Voting Rights Act as well as Plaintiffs' actual assertion of the claim. Not only is Defendant wrong on these points, but his approach exposes his instant Motion to Dismiss for what it really is: an attempt to further delay adjudication of Plaintiffs' claim. Based on Defendant's persistent misrepresentations of the law and facts, the Court should be all the more skeptical of his arguments and refuse to indulge his efforts to waste the

Court's time and to prevent Plaintiffs from receiving redress for their harms. Accordingly, for the reasons set forth below as well as in Plaintiffs' first opposition to Defendant's motion to dismiss, ECF No. 27, which is incorporated fully herein and on which Plaintiffs rely, Plaintiffs respectfully request that this Court deny Defendant's motion to dismiss.

## II.    LEGAL STANDARD

A Rule 12(b)(1) attack on subject matter jurisdiction requires the court to accept the sufficiency of the allegations as true. Fed. R. Civ. P. 12(b)(1). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the court] 'presum[es] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citation omitted).

A motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). A complaint does not require detailed factual allegations; it simply must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## III.    ARGUMENT

**A.    Defendant's Jurisdictional Challenges Under Rule 12(b)(1) Fail**

**1.    This case is properly before a single district judge**

Defendant's assertion that 28 U.S.C. § 2284 mandates the convening of a three-judge court in this case is, just as it was the first time Defendant asserted it in his first motion to dismiss, wholly without merit.[1] In making it Defendant ignores not only the statute's plain language, but also the

---

[1] Indeed, in a similar § 2 case challenging a congressional districting plan currently pending in the United States District Court for the Northern District of Georgia, the State of Georgia has agreed that the case is properly before a single district judge and that no three-judge panel is needed or permitted under 28 U.S.C. § 2284. Joint Statement Regarding Assignment of Three-Judge Panel, *Dwight, et al. v. Kemp*, No. 1:18-cv-2869-RWS (N.D. Ga. Sept. 12,

standard principles of statutory interpretation, constitutional avoidance, and long-standing jurisprudence mandating strict construction of statutes permitting three-judge courts.

The plain language of 28 U.S.C. § 2284 provides that "[a] district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed *challenging the constitutionality* of the apportionment of congressional districts or the apportionment of any statewide legislative body" (emphasis added). The text of the statute leaves no room for ambiguity: three-judge courts are convened only where plaintiffs raise constitutional claims. Plaintiffs' Amended Complaint alleges a violation of § 2 of the Voting Rights Act ("VRA")—a statutory, not a constitutional claim. Am. Compl. ¶¶ 90-97. Thus, not only should this case not be referred to a three-judge court, the plain language of the statute dictates that it *cannot* be. *See, e.g.*, *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) ("[W]here, as here, the statute's language is plain, the sole function of the courts is to enforce it according to its terms.") (internal quotation marks and citation omitted); *In re Matter of Hammers*, 988 F.2d 32, 34 (5th Cir. 1993) ("The most certain expression of legislative intent in nearly every instance is the words of the subject statute. We may not look beyond them when, taken as a whole, they are rational and unambiguous."). Defendant's insistence that the Court ignore the plain language of the statute has not become more persuasive upon repetition.

Indeed, the United States Supreme Court has "long held that congressional enactments providing for the convening of three-judge courts must be strictly construed." *Allen v. State Bd. of Elections*, 393 U.S. 544, 561–62 (1969) (citing *Phillips v. United States*, 312 U.S. 246 (1941)); *see also, e.g.*, *Morales v. Turman*, 430 U.S. 322, 324 (1977) ("The ruling . . . merely reflected the consistent recognition that the three-judge court procedure is not a measure of broad social policy

_____

2018), ECF No. 25.

3

to be construed with great liberality, but . . . an enactment technical in the strict sense of the term and to be applied as such." (internal quotation marks omitted)).[2] This is because "[c]onvening a three-judge court places a burden on our federal court system, and may often result in a delay in a matter needing swift initial adjudication. *Allen*, 393 U.S. at 561-62. Consistent with this principle of strict construction, courts have dissolved three-judge panels in § 2 cases that, like this one, did not assert any constitutional claims in challenging statewide redistricting plans. *See, e.g.*, *Rural W. Tenn. African Am. Affairs Council, Inc. v. Sundquist*, 209 F.3d 835, 838 (6th Cir. 2000) (noting that a three-judge panel, which convened after plaintiffs asserted a § 2 *and* a constitutional claim, disbanded itself after plaintiffs filed a second amended complaint solely under § 2 of the Voting Rights Act). And single judges have heard § 2 cases challenging statewide redistricting plans. *See, e.g.*, *Dickinson v. Indiana State Election Bd.*, 933 F.2d 497, 498 (7th Cir. 1991) (appellate opinion discussing § 2 case challenging Indiana's 1981 House apportionment which was heard by a single district court judge). By contrast, Defendant is unable to cite a single case in which a standalone § 2 claim was heard by a three-judge panel. Thus, not only is a referral for a three-judge panel unwarranted here, this Court is not at liberty to expand the scope of 28 U.S.C. § 2284 to include the § 2 statutory claim as any panel would lack jurisdiction to resolve it.

Defendant's effort to construe a Fifteenth Amendment claim from Plaintiffs' § 2 claim is

---

[2] Defendant appears to be well aware of this principle, as he cites *Allen* in support of his argument that a three-judge court should be convened, glossing over its mandate for strict construction. Mot. at 6. *Allen*, however, does not lend Defendant any support. Indeed, in *Allen* the Court found that the three-judge court statute should apply to § 5 of the Voting Rights Act specifically because "[t]he final sentence of s 5 provides that '(a)ny action under this section shall be heard and determined by a court of three judges." *Allen*, 393 U.S. at 561 (citing 42 U.S.C. § 1973c (1964 ed., Supp. I)). The Court also noted that, with respect to the Voting Rights Act, where Congress wanted to, it expressly allowed for three-judge courts in other sections. *See id.* at 562 (discussing similar language in Section 10 of the Voting Rights Act); *see also* 28 U.S.C. § 2284 (mandating three-judge court be convened "when otherwise required by Act of Congress"). No such language exists in § 2. Had it been Congress's intent for three-judge courts to hear § 2 cases, *Allen* demonstrates that Congress certainly knew how to expressly provide as much either in the text of § 2 or in 28 U.S.C. § 2284. To date, although both statutes have been amended multiple times since *Allen*, it has not done so. *See also* Pls.' First Opp. at 7 (explaining that 28 U.S.C. § 2284 was amended in 1984, well after the VRA was amended to include a results test).

similarly misguided. As an initial matter, Defendant provides no support for the proposition that the Court can read a constitutional claim into a plaintiff's complaint where none has been alleged.[3] Rather, in similar jurisdictional contexts, it is a well-settled that "the plaintiff [is] the master of the claim," *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987), and "'[j]urisdiction may not be sustained on a theory that the plaintiff has not advanced.'" *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 809 n.6 (1986)). In fact, this rule is so deeply rooted that even if Plaintiffs in this case were engaging in "artful pleading," as Defendant alleges, to avoid the jurisdiction of a three-judge court (which they are not), such action would likely be entirely permissible, as plaintiffs are regularly allowed to draft their claims to avoid an exercise of jurisdiction. *Caterpillar Inc.*, 482 U.S. at 392 (explaining that the well-pleaded complaint rule allows plaintiffs to "avoid federal jurisdiction by exclusive reliance on state law"); *see also The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913) ("Of course the party who brings a suit is master to decide what law he will rely upon.").

Contrary to Defendant's suggestion, it is the actual claim asserted that triggers jurisdiction, not the facts pleaded, no matter what myriad of claims they would support. *See, e.g.*, *Armour v.*

---

[3] The cases that Defendant cites for this proposition are not simply distinguishable; none of them even remotely advance this argument. Specifically, Defendant relies on *Skinner v. Switzer*, 562 U.S. 521, 530 (2011), for the proposition that "theories do not control over the substance of the allegations." Mot. at 2. This characterization is misplaced. In *Skinner*, the Court assessed whether a plaintiff whose complaint "[was] not a model of the careful drafter's art" could sufficiently state a claim for due process. 562 U.S. at 530. It found that the facts alleged in the complaint would support a due process claim. Notably, the *Skinner* plaintiff *actually agreed that he was asserting a due process legal claim* and, as such, the Court merely made sure that the alleged facts supported it. *Id.* (discussing articulation of claim by counsel at oral argument as due process). As such, *Skinner* is not a case where the Court inferred a legal claim that was distinct from the claim actually articulated and advanced by the plaintiff, which is what Defendant is advocating here. Similarly, *Thompson v. Allstate Ins. Co.*, 476 F.2d 746, 749 (5th Cir. 1973), is a case assessing whether a plaintiff must affirmatively allege that a defendant's actions were "without justification" to protect itself from an affirmative defense when asserting a claim for intentional interference with another's business. It does not concern whether a court can read in an entirely new claim to a plaintiff's complaint. Likewise, *United States v. Raines*, 362 U.S. 17 (1960), *Nevett v. Sides*, 571 F.2d 209 (5th Cir. 1978), and *Irby v. Virginia State. Bd. of Elections*, 889 F.2d 1352 (4th Cir. 1989), all involve cases in which the plaintiffs explicitly alleged a claim under the Fifteenth Amendment—they do not involve instances of the court inferring any such claim, let alone over the plaintiffs' objection.

*Ohio*, 925 F.2d 987, 989 (6th Cir. 1991) ("[T]he sufficiency of the complaint for three-judge jurisdictional purposes must be determined by the claims stated in the complaint and not by the way the facts turn out."); *see also Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 12 (2003) (Scalia, J., dissenting) ("It does not suffice that the facts alleged in support of an asserted state-law claim would also support a federal claim. . . . Jurisdiction may not be sustained on a theory that the plaintiff has not advanced." (internal quotation marks and citation omitted)). Indeed, even if the Court had authority to refer this case to a three-judge court where the Amended Complaint alleges no constitutional claim, general principles of constitutional avoidance would counsel against inferring a constitutional claim that Plaintiffs have not asserted. *Cf. Finch v. Weinberger*, 407 F. Supp. 34, 40 (N.D. Ga. 1975) ("As a general rule, the policy of avoiding unnecessary constitutional adjudication would seem to compel adjudication of the statutory claims first . . . by a single judge.").

Defendant's suggestion that Plaintiffs' factual allegations somehow necessitate a constitutional claim not only misstates the law, it misunderstand the components of a § 2 claim. For example, Defendant asserts that allegations that voters were "packed in the Second Congressional District" or "cracked in CDs 5 and 6" implicate the Fifteenth Amendment. *See* Mot. at 2-3. But "packing" and "cracking" allegations are the hallmark of § 2 effects claims for vote dilution. *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2338 n.2 (2018) (Sotomayor, J., dissenting) ("The § 2 'results' test focuses . . . on vote dilution accomplished through cracking or packing, *i.e.*, 'the dispersal of [a protected class of voters] into districts in which they constitute an ineffective minority of voters or from the concentration of [those voters] into districts where they constitute an excessive majority.'") (quoting *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986)); *Favors v. Cuomo*, No. 11-CV-5632, 2012 WL 928216, at *7 (E.D.N.Y. Mar. 12, 2012) ("Section 2 of the [VRA] . . . is designed to protect against, among other things, redistricting that has the effect of diluting the voting power of

6

racial or language minority groups, which may occur through over-concentration ('packing') or

excessive dispersion ('cracking') of those groups within or across voting districts."). Likewise,

Defendant points to allegations regarding Louisiana's history of voting-related discrimination as

implicating the Fifteenth Amendment. Mot. at 3 (citing Am. Compl. ¶¶ 44-71). Even if Plaintiffs

did allege discriminatory intent on the part of the mapdrawers during the 2011 redistricting process,

a history of voting-related discrimination by government actors is the *first* factor listed in the Senate

Report on the 1982 amendments to the Voting Rights Act which courts are directed to consider in

evaluating a results claim under § 2. *Gingles*, 478 U.S. at 36-37; *see also, e.g.*, *Westwego Citizens*

*for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1211-12 (5th Cir. 1989) ("The first factor

listed in the Senate Report is "the extent of any history of official discrimination" . . . . Thus,

Congress was concerned not only with present discrimination, but with the vestiges of

discrimination which may interact with present political structures to perpetuate a historical lack of

access to the political system." (citations omitted)).

Indeed, Defendant's reliance on the *City of Mobile v. Bolden*, 446 U.S. 55, 61 (1980), a case

that pre-dated the 1982 amendments to the Voting Rights Act, to contend that § 2 and the Fifteenth

Amendment "are essentially identical" ignores the critical distinction between the two:

> The Senate Report which accompanied the 1982 amendments elaborates on the
> nature of § 2 violations and on the proof required to establish these violations.
> First and foremost, the Report dispositively rejects the position of the plurality
> in *Mobile v. Bolden*, . . . which required proof that the contested electoral
> practice or mechanism was adopted or maintained with the intent to discriminate
> against minority voters. The intent test was repudiated for three principal
> reasons—it is "unnecessarily divisive because it involves charges of racism on
> the part of individual officials or entire communities," it places an "inordinately
> difficult" burden of proof on plaintiffs, and it "asks the wrong question." The
> "right" question, as the Report emphasizes repeatedly, is whether "as a result of
> the challenged practice or structure plaintiffs do not have an equal opportunity
> to participate in the political processes and to elect candidates of their choice."

*Gingles*, 478 U.S. at 43-44 (quoting S. Rep. No. 97-417, 97th Cong. 2nd Sess. 28 (1982)). In short,

Defendant can neither foist claims upon Plaintiffs they are not making nor divest this Court of jurisdiction by flatly refusing to engage with the actual allegations and claims asserted in the Amended Complaint. Defendant's willful ignorance of the law of § 2 will not make it go away or transform it into something it is not.

Moreover, to the extent that Defendant misconstrues Plaintiffs' § 2 claim as a racial gerrymandering claim, his argument fares no better. As explained at length in Plaintiffs' opposition to Defendant's first motion to dismiss, *see* Pls.' First Opp. at 2-6, § 2 vote dilution claims and racial gerrymandering claims are "analytically distinct." *Miller v. Johnson*, 515 U.S. 900, 911 (1995); *see also Bethune-Hill v. Va. State Bd. of Elections*, 141 F.Supp.3d 505, 512 (E.D. Va. 2015) (same), *aff'd in part and vacated in part*, 137 S. Ct. 788 (2017); *Ala. Legislative Black Caucus v. Alabama*, 989 F. Supp. 2d 1227, 1290 (M.D. Al. 2013) (same); *LULAC v. Perry*, 548 U.S. 399, 432-33 (2006) (district court's analysis of compactness "for equal protection purposes" is "inapposite" "[u]nder § 2," which "embraces different considerations"). These claims require proof of different elements, call for different remedies, are adjudicated under different legal standards, and address different legal harms. Pls.' First Opp. at 3-6. Construing Plaintiffs' § 2 claim as an intentional discrimination claim under the Fifteenth Amendment or a racial gerrymandering claim under the Fourteenth Amendment, therefore, would essentially force Plaintiffs to prove allegations and present evidence in support of a claim they are not making.

Finally, Defendant's continued reliance on *Page v. Bartels*, 248 F.3d 175 (3d Cir. 2001), fails to provide support for his novel theory that § 2 claims are the equivalent of constitutional claims for jurisdictional purposes. Plaintiffs have already explained at length the multiple reasons *Page* is entirely uninformative here, where Plaintiffs have asserted only a statutory claim. *See* Pls.' First Opp. at 6-7. By referring to a three-judge panel the "action" before it "challenging the

8

constitutionality" of a statewide redistricting plan, the *Page* ruling falls squarely within the plain language of 28 U.S.C. § 2284(a). *See also Rural W. Tenn. African Am. Affairs Council*, 209 F. 3d at 838 (convening three-judge panel where plaintiffs raised constitutional and statutory claims and then disbanding the panel after plaintiffs filed a second amended complaint solely under § 2 of the Voting Rights Act). The *Page* holding thus has no bearing on this case.

Defendant once again requests an immediate certification of interlocutory appeal of this issue under 28 U.S.C. § 1292(b), stating that the question of whether a three-judge panel is required is "significantly important" and "vital to the judicial economy of this matter." Mot. at 8. As set forth in Plaintiffs' first opposition brief, not only is Defendant's unsupported legal theory far from "significantly important," he fails to articulate the actual test for interlocutory certification. Under 28 U.S.C. § 1292(b), the Court must evaluate whether there is: (1) a controlling question of law at issue, and (2) "substantial ground for difference of opinion." Although Defendant bears the burden of demonstrating these grounds, he has not made any argument supporting either. *See, e.g.*, *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010). This omission is fatal to Defendant's request. Indeed, Defendant's failure to even cite the correct standard—let alone satisfy that standard or respond to Plaintiffs' argument—after having three bites at the apple (Defendant's first motion to dismiss, reply, and the instant motion) is all the more telling of Defendant's efforts to draw out the procedural aspects of the case without any substantive basis.

Ultimately, Defendant's request fails under any standard. The plain language of 28 U.S.C. § 2284 is as unambiguous as Plaintiffs' allegations in support of their single claim under § 2 of the Voting Rights Act. As a result, there is simply no ground supporting a purported difference of opinion, much less a substantial one. This question should not be certified for appeal.

### 2.    Plaintiffs have standing to bring their claims

#### i.    All Plaintiffs have standing because their votes are diluted by Louisiana's 2011 Congressional Map

Defendant once again contends that Plaintiffs lack standing because they have not alleged—and in the case of the Plaintiffs residing in CD 2, cannot allege—that they "would actually live" in the second majority African-American congressional district that Plaintiffs seek as a remedy for the § 2 violation. Mot. at 12-14. Defendant's recycled argument fails for the same reasons set forth in Plaintiffs' first opposition brief. *See* Pls.' First Opp. at 8-9. Specifically, Defendant's standing argument fails to even cite a § 2 case in support, let alone articulate the proper basis for § 2 standing. Defendant instead insists that Plaintiffs abide by the standing rules for racial gerrymandering claims. *See* Mot. at 13 (citing *United States v. Hays*, 515 U.S. 737 (1995)); *see Pope v. Cnty of Albany*, No. 1:11-cv-00736 (LEK/CFH), 2014 WL 316703, at *6 (N.D. NY Jan. 28, 2014) (rejecting reliance on *Hays* because "*Hays* was not a Section 2 case, but a challenge to a redistricting plan on Equal Protection grounds").

Defendant asserts once again that the Amended Complaint does not state sufficient facts to demonstrate that CD 5 and 6 Plaintiffs would be included in a new majority-minority district, as many districts split parishes when they are drawn. Mot. at 14-15. In so doing, he fails to recognize or grapple with the actual allegations set forth in the Amended Complaint. Plaintiffs not only allege that "an additional majority-minority district could be drawn incorporating [the entirety of the parish] where [each Plaintiff] resides," Am. Compl. ¶¶ 19-20, 24-25; *see also id.* ¶ 21-23 ("An additional majority-minority district could be drawn incorporating East Baton Rouge Parish, including the area where [Plaintiff] resides[.]"), but also point to at least two maps which would have created an additional majority-minority district specifically encompassing the very parishes

10

where Plaintiffs reside, *id.* ❡ 35; *see also id*. ❡❡ 9, 93.[4] There is nothing hypothetical about Plaintiffs'

allegations. Rather, Plaintiffs have expressly alleged facts which not only demonstrate the truth of

their allegations, but go far beyond what is needed for this Court to find that Plaintiffs have alleged

sufficient facts to confer standing at this stage of the case. *Lujan v. Defenders of Wildlife*, 504 U.S.

555, 560-61 (1992) ("At the pleading stage, general factual allegations of injury resulting from the

defendant's conduct" suffice to establish standing, because the Court "presume[s] that general

allegations embrace those specific facts that are necessary to support the claim.") (internal

quotations and citations omitted).[5] Plaintiffs' allegations are more than sufficient to satisfy standing.

**ii.    The Secretary of State is the proper defendant as the harm is fairly
traceable to him and he is necessary to redress Plaintiffs' harm**

Defendant's standing arguments with respect to redressability are contrary to decades of

precedent and do not support dismissal. Plaintiffs fully briefed this exact argument in their first

opposition brief, and they fully incorporate those arguments herein. *See* Pls.' First Opp. at 10-13.

Indeed, nothing has changed since Defendant first asserted and Plaintiffs first briefed their

opposition to this purported grounds for dismissal. Defendant's failure to so much as acknowledge

the unassailable case law undermining his argument only confirms that the Court need not entertain

this baseless argument.

**B.    Defendant's Rule 12(b)(6) Challenge Also Fails as Plaintiffs have sufficiently alleged
that African-American voters can constitute a reasonably compact majority**

Defendant's argument that Plaintiffs fail to sufficiently allege that African-American voters

can constitute a reasonably compact majority in two districts misunderstands the § 2 compactness

---

[4] Plaintiffs provided the links to these maps in their first opposition brief. *See* Pls.' First Opp. at 10 n.10.

[5] To the extent Defendant seeks a copy of the proposed map(s) Plaintiffs will eventually provide in an expert report to
prove their claims, he has no basis to demand substantive evidence to demonstrate standing at this stage of the
litigation. *Lujan*, 504 U.S. at 560-61; *see also supra* III.B.

11

inquiry and, if adopted, would require a heightened pleading standard well beyond Rule 8's requirements. Read as a whole and with a proper understanding of the law, Plaintiffs' Amended Complaint provides more than sufficient facts to demonstrate compactness.

As an initial matter, Defendant's compactness argument is premised on the assertion that, at the pleading stage, "[s]atisfying the first *Gingles* precondition—compactness—normally requires submitting as *evidence* hypothetical redistricting schemes in the form of illustrative plans." Mot. at 17 (emphasis added). This premise is false. The Fifth Circuit cases that Defendant relies on for this do not evaluate the requirements for *pleading* compactness, but rather discuss the requirements for *proving* compactness—after a trial on the merits and a complete evidentiary record. *See id.* (citing *Gonzalez v. Harris County, Tex.*, 601 Fed. Appx. 255, 258 (5th Cir. 2015) (per curium) (proof of compactness after four-day bench trial); *Fairley v. Hattiesburg, Miss.*, 584 F.3d 660, 669 (5th Cir. 2009) (sufficiency of plaintiffs' proof of claims). To hold that an "illustrative plan," i.e., a proposed map, is required to sufficiently plead compactness would necessarily conflate the pleading standard for § 2 with the evidentiary standard. This is out of line with both the liberal pleading standards of Rule 8 and the Supreme Court's interpretation of the Voting Rights Act. *See, e.g.*, *Chisom v. Roemer*, 501 U.S. 380, 403-04 (1991) ("[The VRA] should be interpreted in a manner that provides the broadest possible scope in combating racial discrimination." (internal quotation marks and citations omitted)).

As previously explained, *see* Pls.' First Opp. at 14-15, the one district court case that Defendant relies on for this proposition, *Broward Citizens for Fair Districts v. Broward County*, No. 12-60317-CIV, 2012 WL 1110053 (S.D. Fla. Apr. 3, 2012), is an outlier. To Plaintiffs' knowledge, no other court has required an illustrative map at the pleading stage or cited *Broward* for this proposition, and it is telling that Defendant, now on his third round of briefing, cannot cite

to one. In fact, one court specifically rejected the *Broward* holding, finding that "requiring the submission of a proposed map with the complaint [extends] what is an evidentiary requirement for summary judgment to the pleading stage of litigation." *Luna v. County of Kern*, No. 16-cv-00568-DAD-JLT, 2016 WL 4679723, at *5 (E.D. Cal. Sept. 6, 2016); *see also Metts v. Murphy*, 363 F.3d 8, 11 (1st Cir. 2004) ("It is no accident that most cases under section 2 have been decided on summary judgment or after a verdict, and not on a motion to dismiss."). The *Luna* court explained that such a requirement would necessarily force factual disputes and require expert analysis, effectively requiring plaintiffs "to develop an unobjectionable map, before discovery even begins." *Luna*, 2016 WL 4679723, at *5.[6]

Defendant claims he does not demand an illustrative map but rather "*some* facts on compactness." Mot. at 20. The Amended Complaint alleges facts aplenty. For instance, the Amended Complaint includes factual allegations regarding the composition and demographics of Plaintiffs' current districts and the proposed majority-minority districts. Am. Compl. ⁋⁋ 5-9. It also points Defendant to at least one example of a map which includes two majority-minority districts that are far more compact than the districts set out in *Hays v. Louisiana*, 936 F. Supp. 360 (W.D. La. 1996), which Defendant has adopted as a rallying cry for compactness. Am. Compl. ⁋ 35. It is not clear what more Defendant could want in terms of fact pleading if it is not Plaintiffs' proposed remedial map, but it is certain that neither Rule 8 nor § 2 of Voting Rights Act require such a submission at this time.

Defendant further assumes that because compactness could not be shown with respect to

---

[6] In addition, the *Luna* court noted that the Eleventh Circuit case relied on in *Broward* for the proposition that a map is required at the pleading stage, *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999), was not, in fact, addressing a motion to dismiss. Rather, it was addressing the elements of proof required at the summary judgment stage. *Luna*, 2016 WL 4679723, at *5.

the majority-minority districts at issue in *Hays*—a racial gerrymandering case from over two decades ago—there is little likelihood that Plaintiffs can demonstrate compactness here, effectively requiring a heightened pleading requirement in instances where previous redistricting challenges have failed. This argument is absurd and, if adopted, would have dire effects on the ability of individuals to assert and protect their fundamental right to vote. *First*, Defendant again baldly asserts that "not much has changed in terms of population percentages" since *Hays*. Mot. at 19. As explained, this ignores the fact that Louisiana experienced significant displacement of its population in 2005 due to Hurricane Katrina, though its overall African-American population remained steady. Am. Compl. ¶ 2. The inference that flows is obvious: as African Americans were displaced from the New Orleans area, their numbers grew more concentrated in other areas of the State, paving the way for a second majority-minority district in 2011 under a VRA-compliant map. Thus, while population percentages in Louisiana, generally, might be similar, percentages alone are not the only measure of compactness.[7] In particular, the second majority-minority district in *Hays* ignored traditional redistricting principles, cutting through contiguous parishes and carving out pockets of voters. *Hays*, 936 F. Supp. at 370. Plaintiffs here allege that a second majority-minority district can be drawn without doing so. Am. Compl. ¶¶ 9, 93; *see also id.* ¶ 35.[8]

Defendant's argument once again reflects a fundamental misunderstanding of § 2. In § 2

---

[7] In truth, it is not even clear what Defendant is comparing when he references population percentages here. The comparable districts in *Hays*, CDs 5, 6, and 2, were entirely different than the districts contained in the 2011 Congressional Map. For example, *Hays* District 5 was composed almost exclusively of parishes in North Louisiana and was drawn horizontally. *Hays*, 936 F. Supp. at 376-77, 360. This is a far cry from the current map, in which District 5 is a vertical district including parishes in North and Central Louisiana as well as the Florida Parishes. *See* Am. Compl. ¶ 6. *Hays* Districts 6 and 2 also had different compositions than their contemporary counterparts. It is thus uninformative at best to compare the population percentages in those districts to the percentages in the 2011 Congressional Map as they do not cover comparable geographic areas and, as such, do not tell the Court anything about the compactness of districts.

[8] Notably, a simple visual comparison of the majority-minority maps proposed during the legislative session, *see* Am. Compl. ¶ 35, and the *Hays* maps, *see* 936 F. Supp.at 373 (Appendix I), demonstrates that a more compact majority-minority district can be drawn.

vote dilution cases, the focus of the compactness inquiry is on "the compactness of the minority population," not a particular district. *LULAC v. Perry*, 548 U.S. at 433-34 ("[T]he inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries." (quotation marks and citations omitted)). Under this framework, Plaintiffs have pleaded sufficient facts for the Court to infer a plausible § 2 claim. For example, the Amended Complaint sets forth the substantial African-American voting age population residing in CDs 2, 5, and 6. Am. Compl. ₱ 8. It alleges that these districts include contiguous parishes, such as East and West Feliciana, St. Helena, Pointe Coupee, West Baton Rouge, and Avoyelles, fracturing the African-American voters within them across the districts. *Id.* ₱ 6; *see also id.* ₱ 7 ("CD 6—which wraps almost entirely around CD 2—encompasses the remaining portions of the River Parishes that CD 2 left behind, while also including the African Americans that were excluded from CD 5."). And it asserts that "African Americans in Louisiana are sufficiently numerous and geographically compact to form a majority of eligible voters in a second congressional district—including but not limited to districts which track the current trajectory of CD 5 as well as districts respecting traditional North, Central, and South Louisiana divisions." *Id.* ₱ 9; *see also id.* ₱ 93. Taken together, these facts are more than sufficient to infer that African Americans residing in a relatively compact area, and comprising traditional communities of interest (e.g., the Florida Parishes), are sufficiently numerous to form a second majority-minority district, and Plaintiffs plainly meet the requirements under Rule 8. *See Hall v. Louisiana*, 974 F. Supp. 2d at 992 (finding plaintiffs had successfully pleaded a § 2 claim based on similar facts); *Luna*, 2016 WL 4679723 at *5 (same).

## C.    Plaintiffs' Claim Is Not Barred By Laches

Defendant argues, as he did in his previous motion to dismiss, that Plaintiffs' claim is barred by laches. Plaintiffs explained at length that because Plaintiffs seek prospective relief, Am. Compl.

¶ 97, laches does not apply. *See* Pls.' First Opp. at 17-20. Plaintiffs further explained that even if laches did apply, Defendant fails to establish the essential elements of a laches defense: "(1) delay in asserting a right or claim; (2) that the delay was inexcusable; and (3) that undue prejudice resulted from the delay." *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998) (quotations and alterations omitted). Despite now having three opportunities to brief this issue, Defendant still *asserts no facts whatsoever* indicating how, if at all, he may be prejudiced. Rather than even attempt to satisfy his burden, Defendant argues his burden to establish laches is not so great, citing *Maxwell v. Foster*, No. Civ.A.98-1378, 1999 WL 33507675, at *3 (W.D. La. Nov. 24, 1999), to contend that a reduced showing of prejudice is required here. As an initial matter, even if Defendant were correct that the legal standard requires a reduced showing of prejudice, Defendant *has made no showing* of prejudice. Moreover, much like his arguments on compactness, Defendant's reliance on *Maxwell* at this stage is inappropriate. In *Maxwell* the court issued its opinion after the close of discovery on a motion for summary judgment. As such, findings made with respect to laches were factual. *See id.* (citing to deposition testimony as proof of inexcusable delay).[9] The record in this case will undoubtedly be different, and particularly so where Plaintiffs Johnson, Rogers, Smith, and Hart, as new residents and voters, could not have brought their claims sooner. *See* Pls.' First Opp. at 19 n.18. In short, Defendant cannot short-circuit Plaintiffs' claim for prospective relief by shrugging off the unmistakable allegations of vote dilution among the African-American voters whose voting rights he is charged to protect. Accordingly, this Court should reject Defendant's argument on laches.

---

[9] Because "laches is a fact-intensive affirmative defense, some courts consider it an 'unsuitable basis for dismissal at the pleading stage.'" *Spiral Direct, Inc. v. Basic Sports Apparel, Inc.*, 151 F. Supp. 3d 1268, 1280 (M.D. Fla. 2015) (citation omitted). Thus, it is only where a "complaint on its face shows that . . . laches bars relief" that it may properly be dismissed under Rule 12(b)(6). *Id.* (citations omitted).

## IV.    CONCLUSION

For the foregoing reasons, and all of the reasons set forth in Plaintiffs' first opposition brief,

ECF No. 27, Plaintiffs respectfully request that the Court deny Defendant's Motion to Dismiss.

Dated: September 25, 2018                    Respectfully submitted,

*s/Darrel J. Papillion*
Darrel J. Papillion (Bar Roll No. 23243)
Renee C. Crasto (Bar Roll No. 31657)
Jennifer Wise Moroux (Bar Roll No. 31368)
**WALTERS, PAPILLION,**
**THOMAS, CULLENS, LLC**
12345 Perkins Road, Building One
Baton Rouge, LA 70810
Phone: (225) 236-3636
Fax: (225) 236-3650
Email: Papillion@lawbr.net
Email: crasto@lawbr.net
Email: jmoroux@lawbr.net

Marc Erik Elias (admitted pro hac vice)
Bruce V. Spiva (admitted pro hac vice)
Amanda R. Callais (admitted pro hac vice)
Perkins Coie, LLP
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 654-6338
Fax: (202) 654-9106
Email: MElias@perkinscoie.com
Email: BSpiva@perkinscoie.com
Email: ACallais@perkinscoie.com

Abha Khanna (admitted pro hac vice)
Perkins Coie, LLP
1201 Third Avenue, Ste. 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000
Email: AKhanna@perkinscoie.com

*Attorneys for Plaintiffs*

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 25, 2018, Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss was filed electronically with  the Clerk of Court using the CM/ECF system.


_s/ Jennifer Wise Moroux_
Jennifer Wise Moroux

1